IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Norfolk Division

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>KEVIN ERIC BLANDING,<br><br>Defendant. | Case No. 2:25-cr-56 |

GOVERNMENT'S TRIAL BRIEF ON GLOBAL POSITIONING SYSTEM DATA

    GPS is everywhere.  Google Maps and other software has demystified latitude and longitude by enabling users to plug long numbers into a text box, hit Enter, and watch a point pop up on a map.  No expertise required.  In this trial, two government witnesses will testify that they were human users of software.  Case law has held for over a decade that the specific, GPS-related testimony the government intends to offer does not require the specialized knowledge required for the testifying witnesses to be qualified as expert witnesses under Rule 702.

I.    <u>Factual background</u>

    In or about April 2024, the United States Postal Inspection Service ("USPIS") was notified by the Suffolk, Virginia post office of suspected break-ins to U.S. Mail Service ("USMS") blue mail collection boxes at the Suffolk Main Post Office ("SMPO") at 445 N. Main St., Suffolk, Virginia.  In response, USPIS and the SMPO arranged to have placed in a collection box a GPS device hidden within a dummy package.  The GPS device was designed to alert USPIS when it was removed from the collection box.

    On Sunday, May 5, 2024, at approximately 9:59 p.m., USPIS received an electronic alert, generated by the GPS device, that the GPS-device-containing package had been removed from

the collection box at SMPO. USPIS was able to follow the path of the GPS device as it continued to travel north and identified the vehicle in which the device was traveling, and requested local law enforcement to assist.

When location data from the GPS tracker showed that the tracker had crossed into Isle of Wight County, Deputy Miranda Atkinson of the Isle of Wight County Sheriff's Office observed the vehicle pull in to a 7-11 gas station on Carrollton Road and park next to a gas pump. Deputy Atkinson first made contact with the driver of the vehicle, later identified as the defendant, Kevin Eric Blanding, at approximately 10:34 p.m. The GPS tracker data reflected that the tracker was pinging at that same gas station at that time.

When the vehicle was later towed to a postal facility, the location data from the GPS tracker followed the path of the tow truck to the postal facility. On May 6, 2024, U.S. Magistrate Judge Lawrence R. Leonard approved a search warrant for the contents of the Subject Vehicle. Inside, USPIS located numerous pieces of uncanceled mail, USPS packages, and the dummy package containing the GPS device.

At trial, USPIS senior technical surveillance specialist Allan Petree will testify that he is responsible for the GPS tracker units used by USPIS in the Hampton Roads area, including Suffolk. He will testify that he is a custodian of the data generated by the trackers and that data generated by the devices satisfy Federal Rule of Evidence 803(6). He will testify that most of the GPS trackers used to prevent and investigate mail theft, including the tracker used in this case, are purchased by USPIS from Ensurity. He will testify that he is a certified technical investigator and has received training from Ensurity on use of the Ensurity trackers. He will testify that the app that interacts with the tracker is created by Ensurity and is easy to operate, as exemplified by the fact that many postal inspectors who use the Ensurity trackers are able to use

the devices and app without training, or with instructions located on Ensurity's website. He will further testify that the trackers are not customized for USPIS and are commercially available for purchase from Ensurity. Finally, Petree will testify that the Ensurity software exports reports containing all of the locations the tracker has visited during the timeframe provided by the user.

ATF Special Agent Nick Ivone will testify that he took the location data generated by the Ensurity software — specifically, the latitude and longitude locations — and fed the data into a computer program that generates maps. Consistent with the spirit of Rule 1006, this allowed Agent Ivone to create a summary exhibit in which the location data from the tracking device, which "cannot be conveniently examined in court," can be visualized on street maps. Copies of the underlying GPS data and the summary exhibit have been provided to the defense.

II.     Applicable law and rules

A witness not testifying as an expert may provide opinions that are limited to those rationally based on the witness's perception, helpful to clearly understanding the witness's testimony or to determining a fact in issue, and "not based on scientific, technical, or other specialized knowledge *within the scope of Rule 702*." Fed. R. Evid. 701 (emphasis added). Whether testimony must be presented by an expert witness depends on "the characteristics of the testimony, not the witness." *United States v. Jimenez-Chaidez*, 96 F.4th 1257, 1268 (9th Cir. 2024) (citing *United States v. Caballero*, 277 F.3d 1235, 1247 (10th Cir. 2002) ("[W]itnesses need not testify as experts simply because they are experts—the nature and object of their testimony determines whether the procedural protections of Rule 702 apply.")).

"[T]he admissibility of Global Positioning System evidence has been accepted, without serious question, as being accurate and reliable, so much so that expert testimony is not required to establish the technical basis for such presumed accuracy and reliability; indeed, the court may

simply take judicial notice of such accuracy." EXAMINATION OF WITNESSES § 12:50 (2d ed.) (citing *United States v. Brooks*, 715 F.3d 1069, 1078–80 (8th Cir. 2013)). In *Brooks*, the Eighth Circuit affirmed the district court's judicially noticing the accuracy and reliability of GPS technology, reasoning that

> [c]ommercial GPS units are widely available, and most modern cell phones have GPS tracking capabilities. Courts routinely rely on GPS technology to supervise individuals on probation or supervised release, and, in assessing the Fourth Amendment constraints associated with GPS tracking, courts generally have assumed the technology's accuracy . . . . Further, Brooks provides no reason to undermine the district court's conclusion beyond his mere assertion that GPS technology is "relatively new." Courts, however, have addressed the use of GPS technology for more than a decade.

*Brooks*, 715 F.3d at 1078.

In *Brooks*, the prosecution presented evidence that Brooks robbed a credit union and received, in addition to cash, a "GPS tracking device that was concealed in a stack of twenty dollar bills." *Id.* at 1073. The credit union's security company followed the path of the GPS tracker and noticed that it stopped two to three miles from the credit union, where a witness said that she found a man who "offered her $1,000 to allow him to hide in the van." *Id.* After she refused, the man drove away in her van. *Id.* Police shortly thereafter located the van, which was driven by Brooks. *Id.* at 1073–74. Inside the stolen van was "a bundle of money. The bundle contained four intact twenty-dollar bills — two on the top and two on the bottom — and sixty twenty-dollar bills with the center portions removed and a GPS device placed inside. The GPS device was the same one that was taken from the credit union and tracked by the security company." *Id.* at 1074.

The Eighth Circuit rejected Brooks's argument that a witness with a "scientific background" was a prerequisite for the witness to testify about the GPS data. At trial, a

representative of the credit union's security company laid foundation for the prosecution's admission of GPS evidence. *Id.* The witness, an account executive, "had been trained by the company, he knew how the device worked, and he had demonstrated the device for customers dozens of times." *Id.* The Eighth Circuit found it significant that the reliability of the GPS tracking device was corroborated by other evidence:

> The device was activated near the credit union just seconds after the robbery. The signal indicated that it then moved to the apartment parking lot where physical evidence and [the van owner's] testimony place Brooks at the time he allegedly stole the white van. Then, the signal reported that the device traveled along the same route where Officer Curtis saw the stolen van. Finally, police tracked the device and recovered it from inside a stack of money from the credit union at the same parking lot where they found Brooks.

*Id.* at 1078–79.

Because the GPS records were nontestimonial, the Eighth Circuit rejected Brooks's argument that the GPS tracking reports violated the Confrontation Cause. *Id.* at 1079. As the Eighth Circuit observed, the relevant question is whether a record was "created . . . for the purpose of establishing or proving some fact *at trial*." *Id.* at 1079 (quoting *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 324 (2009)) (emphasis supplied in *Brooks*). "Although the [GPS] reports ultimately were used to link [Brooks] to the bank robbery, they were not *created* for this purpose . . . . Instead, the GPS evidence was generated by the credit union's security company for the purpose of locating a robber and recovering stolen money." *Id.* at 1080 (emphasis in original). Moreover, "the GPS tracking reports here were merely computer printouts of information generated by accepted technology. There was no human analysis, and as explained above, they did not require expert testimony for their introduction." *Id.* at 1080 n. 4. "Therefore,

the GPS reports were non-testimonial, and their admission did not violate Brooks's Confrontation Clause rights." *Id.* at 1080 (emphasis in original).

*Brooks*, which noted courts having addressed the "use of GPS technology for more than a decade," is now itself over a decade old. Before *Brooks*, the Third Circuit had held that the district court had properly allowed lay-witness testimony concerning the operation of a GPS device. *United States v. Thompson*, 393 Fed. App'x 852, 858, 859 (3d Cir. 2010). And in the First Circuit, a district court judge commented, "Do you know how many thousands of GPS [*sic*] are in the market today?", "I have one in my pocket right now," "You don't have to be a rocket scientist to read a GPS . . . My nine year old can do that," and "You don't have to be an expert to plot on a nautical map." *United States v. Espinal-Almeida*, 699 F.3d 588, 611 (1st Cir. 2012). The First Circuit questioned whether "the ability to read and plot coordinates from a GPS [was] as banal as the district court made it out to be," *id.*, but ultimately agreed that "[t]he issues surrounding the processes employed by the GPS and software, and their accuracy, were not so scientifically or technologically grounded that expert testimony was required to authenticate the evidence," *id.* at 612.

As GPS has continued its march toward ubiquity, courts not surprisingly have continued to find that GPS technology need not be introduced through expert witnesses under Rule 702. Last year, the Ninth Circuit addressed a defendant's argument that a district court abused its discretion in allowing an FBI agent to testify as a lay witness about "extracting and 'parsing' location data from [a] cellphone; and about [the agent's] interpretation of the GPS coordinates and time stamps recovered from the cellphone." *United States v. Jimenez-Chaidez*, 96 F.4th 1257, 1267 (9th Cir. 2024). Suspecting Jimenez's involvement in drug trafficking, the agent connected a cooperating witness's cell phone "to extract the data." *Id.* at 1263. The agent

testified that "the Cellebrite report could be understood without any knowledge of software." *Id.* The report contained, among other information, "time-stamped GPS coordinates from a frequently visited locations database. [The agent] explained that he entered the GPS coordinates from the report into Google Maps to identify the location," confirming that the cooperating witness's phone was near Jimenez's workplace during Jimenez's shifts. *Id.*

Jimenez objected to the agent's testimony "because the Government failed to disclose him as an expert witness before trial," and the prosecution responded that "it was offering [the agent] only as a lay witness 'in his capacity as a forensic examiner who looked at a phone and found some items.' " *Id.* When the district court asked the prosecutor, "So he plugged in the phone and it downloaded, and he's going to say what was on the phone?", the prosecutor responded affirmatively, and Jimenez withdrew his objection. *Id.*

On appeal, Jimenez argued that the district court's admission of the agent's testimony as a lay witness was an abuse of discretion. *Id.* at 1267. Analyzing Rule 701, the Ninth Circuit held that "a lay witness may testify to the information extracted from a phone so long as the testimony does not require 'specialized knowledge.' " *Id.* (quoting Fed. R. Evid. 701(c)). In the case of location data, the panel observed, citing *Brooks*, that "GPS information is readily available and understandable to the general public," *Id.* at 1267 (citing *Brooks*, 715 F.3d at 1078). "[T]he Cellebrite report that contained this information was in a format that was easily understandable to anyone familiar with GPS coordinates. [The agent's] testimony about this information and how it was obtained largely was not opinion testimony, and to the extent it was, it was based on his perception and not specialized knowledge." *Id.* (citing *United States v. Montijo-Maysonet*, 974 F.3d 34, 47 (1st Cir. 2020) (a government witness was not required to testify as an expert when "all she did was to read from the [extraction] report")).

The Ninth Circuit disagreed with Jimenez that the agent's having "parsed and analyzed the data to create a report" crossed into expert territory, since the agent "testified that 'parsing' means presenting digital code in a legible format and that Cellebrite is used for 'analyzing and parsing data' and can create reports that are easily understood without technical knowledge." *Id.* at 1267–68. The panel allowed that "there may be cases involving Cellebrite or other similar technology that do require expert testimony, particularly where the functionality or reliability of the technology is challenged or otherwise at issue," but that Jimenez's was not that case because the prosecution "limited the scope of [the agent's] testimony to his use of the Cellebrite software and his perceptions of the data that the software produced that are readily understandable without having him opine about the software's technical processes or reliability or other issues that require specialized knowledge." *Id.* at 1269.

III.   Analysis

The government's proposed testimony is admissible through a lay witness under Rule 701 because the testimony does not require "specialized knowledge within the scope of Rule 702," Fed. R. Evid. 701(c), such as the accuracy or reliability of the GPS tracking device. *Cf. Jimenez-Chaidez*, 96 F.4th at 1269 (suggesting that testimony about "technical processes or reliability" would require qualification of a witness under Rule 702). Similar to *Brooks*, the custodian of the GPS trackers and data, Petree, knows how the devices work, received training on the devices, and has demonstrated use of the devices for postal inspectors.

Also as in *Brooks*, the reliability of the GPS tracker here is corroborated by other evidence. The motion-activated GPS tracker first alerted at the Suffolk post office, where an unusually low volume of mail was discovered on the following Monday morning. At least one witness for the government will testify that they left mail at that same collection box. The

tracker data suggest that the tracker stopped at a second post office in Suffolk, and a witness for the government that they left mail at a collection box in front of that second post office. The tracker data facilitated Deputy Atkinson's identification of a vehicle likely to have contained the tracker, as the tracker's app showed the tracker stopped and in motion when Deputy Atkinson saw the vehicle stopped and in motion. The tracker data showed that the tracker was stopped at the same gas station where police contacted the two occupants of the vehicle. When the occupants' vehicle was towed to a postal facility in Chesapeake, the tracker data showed the tracker following the path of the tow truck before stopping at the Chesapeake postal facility. And investigators recovered the tracker from the vehicle.

Similar to the agent in *Jimenez* who connected a phone to user-friendly software that created a report, Petree will testify that he used Ensurity software to create a report that, in essence, is a list of all of the places the tracker went between two times. He will testify that no specialized knowledge is required to do so; indeed, postal inspectors who use the trackers but have not received training from Ensurity regularly use the devices without difficulty. As the prosecutor bluntly put it in *Jimenez*, the government here is offering Petree as a witness who "found some items." *Jimenez*, 96 F.4th 1263. In fact, the testimony proffered by the government in this case is less specialized than that in *Jimenez*, since in the latter case an entire cell phone was extracted and GPS data found within it. Here, we are dealing with a device that does one thing only: record locations.

Admission of the proffered testimony is consistent with the Confrontation Clause for the same reasons the Eighth Circuit so held in *Brooks*. The GPS records are nontestimonial because they were not created "*for trial*," *Brooks*, 715 F.3d at 1079 (emphasis in original), but were created to prevent mail theft and to apprehend suspected mail thieves. As in *Brooks*, the GPS

tracking device was used on the same day at the suspected crime to track the suspected perpetrators "in an ongoing pursuit." *Id.* at 1080.

Defense counsel analogize this case with the Seventh Circuit's opinion in *White v. Hefel*, 875 F.3d 350 (7th Cir. 2017). But the analogy is imperfect. In *White*, the GPS data was superfluous because the parties to the civil case did not dispute where the Chicago police had gone. There was no need, the district and circuit courts agreed, to "risk . . . confusing the jury with marginally relevant details about the GPS system used by the Chicago police . . . ." *Id.* at 355. The evidence was therefore excluded under Rule 403, not Rules 701 or 702. Because Rule 403 was the district court's basis for excluding the GPS evidence — which the Seventh Circuit agreed with — the Seventh Circuit's Rule 702 analysis is limited to one paragraph. *White* does not appear to have been cited on this point, and the government was not able to locate any Seventh Circuit (or Fourth Circuit) authority on the question.

Acknowledging *Brooks*, *Espinal-Almeida*, and *Thompson*, defense counsel argues that the witnesses in those cases were allowed to testify as lay witnesses because they were really expert witnesses. The First, Third, and Eighth Circuit opinions do not say that. The opinions do not "*purport* to stand for the proposition that expert testimony is not required." ECF No. 48 at 6 (emphasis added). They *do* stand for that proposition. Witnesses with scientific and other qualifications may testify as lay witnesses. "[W]itnesses need not testify as experts simply because they are experts — the nature and object of their testimony determines whether the procedural protections of Rule 702 apply." *Caballero*, 277 F.3d at 1247. In this trial, the government will offer no expert testimony.

In their memorandum on this issue, defense counsel assume that Petree's testimony will include information about the "reliability and accuracy" of the tracking devices that the

-10-

government does not intend to offer in its case-in-chief through Petree or through any witness. *See* ECF No. 48 at 2–3. The slides created by Petree were provided to the defense team in the interest of transparency and will be not offered by the government at trial.

IV. <u>Conclusion</u>

Is specialized knowledge needed to direct user-friendly software to list latitude and longitude in a spreadsheet? Those appellate courts that have confronted squarely this and similar questions have answered that it is not. The government reiterates that while its witnesses may in other circumstances have backgrounds that may qualify them as expert witnesses, the government during this trial will not elicit expert *testimony*. The case law is clear that the testimony that the government intends to introduce through Petree and Ivone is not expert testimony.

Respectfully submitted,

Lindsey Halligan
United States Attorney

By:     /s/
Anthony C. Marek
Joseph Kosky
Attorneys for the United States
United States Attorney's Office
101 West Main Street, Suite 8000
Norfolk, VA 23510
Office: (757) 441-6331
Fax: (757) 441-6689
E-Mail: Anthony.Marek@usdoj.gov